# Exhibit A

| | |
|---|---|
| **From:** | Anne Sills <asills@segalroitman.com> |
| **Sent:** | Tuesday, January 12, 2016 10:29 AM |
| **To:** | Darren Corrente <darren@correntelawri.com>; jgrosso@ogglaw.com |
| **Cc:** | Barry McAnarney <BMcAnarney@mlbf.org>; Joe Bonfiglio <JBonfiglio@masslaborers.org> |
| **Subject:** | Absolute and AQE |
| **Attach:** | Alter ego memo.docx |

Please see alter ego memo prepared by an attorney in our office.  Her conclusions are that the Funds might not be able to establish alter ego liability given disclosure by the 2 companies to the Union of their decisions to operate union and non-union and the fact that in the case of AQE it formed the Union company after the non-union.  Not true of Absolute altho the fact that they signed the union company and formed the non-union company 3 months later -- after notice to the union - might put them in the same place.  They may be liable however under the single employer analysis which we won't know until we audit their books and records and determine the extent of cross-over of the work forces.

Anne R. Sills, Esq.
Segal Roitman, LLP
111 Devonshire Street, 5th Floor
Boston, MA 02109
o) (617)742-0208 ext. 232
f) (617)742-2187
d)(617)603-1423
asills@segalroitman.com

CONFIDENTIAL

<u>**MEMORANDUM**</u>

**To:**   Anne Sills

**From:** Olivia Singer

**Date:**  January 12, 2015

**Re:**    Possible Single Employer and Alter Ego Status of Absolute Environmental, Inc./Absolute Environmental Contractors, Inc. and Air Quality Experts, Inc./AQE, Inc.

---

<u>**Questions Presented**</u>

- Is a court likely to find that Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. are alter egos? Is a court likely to find that Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. are single employers? Is a court likely to find that the employees of Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. constitute a single bargaining unit?

- Is a court likely to find that Air Quality Experts, Inc. and AQE, Inc. are alter egos? Is a court likely to find that Air Quality Experts, Inc. and AQE, Inc. are single employers? Is a court likely to find that the employees of Air Quality Experts, Inc. and AQE, Inc. constitute a single bargaining unit?

<u>**Brief Answer**</u>

- Given the facts at hand, it is unclear whether a court is likely to find that Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. are alter egos. Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. share all of the essential structural factors that the First Circuit looks for in finding alter ego status. The companies have a continuity of ownership, the same management, business purpose, operation, equipment, supervision and employees. The creation of the second company has effectively allowed the first to avoid labor obligations. However, the company claims to have disclosed this relationship to the Union at all relevant times. This fact may

1

MLDC00000001565

support an argument that the non-union company was not a sham created to avoid labor obligations. It is not entirely clear how much weight a court would give this factor. On the other hand, since the companies have an interrelation of operations, centralized control of labor relations, common management and common ownership, a court is likely to find that Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. constitute a single employer. Since the two companies appear to use the same employees interchangeably for projects performing similar work, a court may also find that these employees constitute a single bargaining unit. As a single employer covering a single bargaining unit, a court would likely hold both the union and non-union companies liable for provisions in the collective bargaining agreement.

- A court is not likely to find that Air Quality Experts, Inc. and AQE, Inc. are alter egos. Although Air Quality Experts, Inc. and AQE, Inc. share significant overlap in ownership, management, business purpose, operation, equipment, customers and supervision, there is no evidence that creation of AQE, Inc. allowed Air Quality Experts, Inc. to avoid any pre-existing labor obligations. Air Quality Experts, Inc. had only limited Project Agreements with the Union and had retained its right to remain non-union on all other projects. AQE, Inc. was formed after and signed a CBA with the Union. The fact that Air Quality Experts, Inc. and AQE, Inc. share the same employees may support a finding of alter ego status, but it is unclear whether this factor alone is sufficient to tip the scale. Alternatively, however, a court may find that Air Quality Experts, Inc. and AQE, Inc. are a single employer. The two companies share interrelated operations, centralized control of labor relations, common management, and common ownership. Given the apparent interchange of employees between the two companies, a court may also find that these employees constitute a single bargaining unit. If the court finds that the companies are a single employer and that the employees constitute a single bargaining unit, a court will likely hold that both companies are bound to the provisions of the collective bargaining agreement.

### Legal Analysis

2

MLDC00000001566

In order to bind a non-union company to a collective bargaining agreement and similar contractual commitments made by its union counterpart, a court must find that the two companies are a single employer and the employees of each constitute a single bargaining unit or that the companies are alter egos. See C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 353-354 (1st Cir. 1990). Here, it appears that both sets of companies readily meet the standard for single employer status and that with more information a court may find that their employees constitute single bargaining units. It is less clear whether these companies meet the requirements for a finding of alter ego status. Given factors weighing for and against such a finding, a more detailed explanation of the alter ego analysis follows.

*Single Employer Status*

The Supreme Court has enumerated four factors for determining whether two entities constitute a single employer: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. See Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. Of Mobile Inc., 380 U.S. 255, 256 (1966). The First Circuit has applied these factors and recognized that "No one of these factors is controlling, nor need all of them be present. Single employer status ultimately depends on 'all the circumstances of the case' and is marked by an absence of an 'arm's length relationship found among unintegrated companies.'" Penntech Papers, Inc. v. N.L.R.B., 706 F.2d 18, 25 (1st Cir. 1983).

Here, both Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. and  Air Quality Experts, Inc. and AQE, Inc. seem to possess all the factors necessary for a finding of single employer status. In both cases, since the companies share the same office space and equipment, they have a clear interrelation of operations. The two sets of companies also appear to have the same active directors indicating common management. For both pairs, the same supervisors monitor employees for both companies and these employees appear to work interchangeably for both the union and non-union companies supporting a finding of centralized control of labor relations. Common ownership also appears present since the wives of the owners of Absolute Environmental, Inc. are the owners of record for Absolute Environmental

3

CONFIDENTIAL

MLDC00000001567

Contractors, Inc. Similarly, the wives of the owners of Air Quality Experts, Inc. are the owners of record for AQE, Inc.. Courts have found common ownership where a family member owns the subsequently created company. See e.g. Belmont Concrete Corp., 139 F.3d at 308; Deer Creek Electric Inc., 362 NLRB No. 171 (Aug. 17, 2015).

Upon a finding of single employer status, the court will next inquire whether the employees of the two companies constitute a single bargaining unit. In order for the non-union company to be bound by the collective bargaining agreement signed by the union company, the employees of both companies must form a single bargaining unit.  In determining whether a group of employees properly constitute an appropriate bargaining unit, the National Labor Relations Board focuses on whether the employees share "a community of interest." In Re Specialty Healthcare & Rehab. Ctr. of Mobile, 357 NLRB No. 83 (Aug. 26, 2011), *quoting* NLRB v. Action Automotive, Inc., 469 U.S. 490, 491 (1985). Factors that may point to a community of interest between employees include "mutuality of interest in wages, hours, and other working conditions; commonality of supervision; degree of skill and common functions; frequency of contact and interchange with other employees; and functional integration." Bartlett Collins Co., 334 NLRB 484, 484 (2001).  From the information so far acquired regarding Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc., it is likely that a court will find that employees from the two companies constitute a single bargaining unit since the companies appear to share virtually the same employees. These employees also appear to perform similar work under the same supervisors. Further discovery may be necessary to better understand how much interchange of employees occurs. If the same workforce moves between the two companies, it is likely that a court will find them to be the same bargaining unit. Similarly, initial information gathered regarding employees at Air Quality Experts, Inc. and AQE, Inc. indicates that these employees move back and forth between the two companies. If the same employees work for both companies performing essentially the same work under the same supervision, a court is likely to find that they constitute a single bargaining unit. If the Fund can establish that these two sets of companies are single employers and their employees constitute single bargaining units, the Fund should be able to hold both the union and the non-union company liable for contributions.

*Alter Ego Status*

4

MLDC00000001568

In determining whether one company is the alter ego of another company, the First Circuit considers a variety of factors including "continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus- i.e., 'whether the alleged alter ego entity was created and maintained in order to avoid labor obligations.'" Mass. Carpenters Central Collection Agency v. Belmont Concrete Corporation, 139 F.3d 304, 308 (1st Cir. 1998), *quoting* NLRB v. Hospital San Rafael, 42 F.3d 45, 50 (1st Cir. 1994) *and citing* C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 354 (1st Cir. 1990). The alter ego doctrine is an equitable doctrine that seeks to prevent employers from avoiding labor obligations through a "mere technical change in the structure or identity of the employing entity… without any substantial change in its ownership or management." Hospital San Rafael, Inc., 42 F.3d at 51, *see also* Belmont Concrete Corporation, 139 F.3d at 307. The First Circuit has recognized that "No one factor is controlling and all need not be present to support a finding of alter ego status." C.E.K., 921 F.2d at 354.

In weighing the relative importance of each possible factor, the First Circuit's treatment of anti-union animus appears to be the least clear. In C.E.K., 921 F.2d at 354, citing Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 24 (1st Cir. 1983), the First Circuit noted that "the critical distinction between single employer and alter ego analysis is the presence or absence of anti-union animus." This is significant because "[a] finding that two employers are alter egos will bind the nonsignatory to a collective bargaining agreement between the union and the nonsignatory's alter ego." Belmont Concrete Corp., 139 F.3d at 304. On the other hand, "[a] finding of single employer status does not mean that one business is bound by a union contract signed by another, absent an additional finding that the employees of each constitute a single appropriate bargaining unit." C.E.K., 921 F.2d at 353-54.

In C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 354 (1st Cir. 1990), a non-union company, Cam-Ful, was incorporated as a real estate company. The owner of Cam-Ful then created C.E.K., a separate company also specializing in construction contracting work. C.E.K. entered into a CBA with a Plumber's Union. After C.E.K. signed the CBA, the owner of both companies changed the corporate purpose of Cam-Ful to construction contracting. This allowed for bidding on both union and non-union projects. After a time, the owner of both companies decided to close C.E.K. and transferred his two C.E.K. employees over to Cam-Ful.

CONFIDENTIAL

MLDC00000001569

Cam-Ful "completed the work which remained on projects begun by C.E.K." Id. at 352. The First Circuit upheld an NLRB decision finding alter ego status noting that the companies shared substantially identical management, business purpose and operation.  The Court found anti-union animus since the owner "used obstructionist tactics in failing to respond to the Union [when asked about Cam-Ful], thus demonstrating anti-union animus. " Id. at 355.

In contrast, in Hospital San Rafael, Inc., 42 F.3d at 51, the Court stated that a finding of anti-union animus is not required to sustain a finding of alter ego status. The First Circuit then went even further, writing: "In particular, there is no rule that wrongful motive is an essential element of a finding of alter ego status." Belmont Concrete Corp., 139 F.3d at 308, *citing* Hospital San Rafael, Inc., 42 F.3d at 51, *see also* Raso v. Pegasus & Sons Masonry Co., No. CIV.A. 15-10730-ADB, 2015 WL 3833737, at *2 (D. Mass. June 22, 2015). In Hospital San Rafael, owners of a hospital that became unionized decided to build a new hospital rather than continue operating a quickly deteriorating one. The Court noted, "The decision of San Rafael's owners to establish a new hospital occurred for financial and operational reasons that have nothing to do with labor relations. The union did not even exist when the original plans for the new hospital were laid." Hospital San Rafael, Inc., 42 F.3d at 51. In finding alter ego status, the court emphasized the continuity of ownership, calling this "perhaps the most important predicate" and the substantial similarities in business purpose, operation and management between the two companies. Id. The Court found that these similarities meant that the second company was "obligated to recognize and bargain with the union; that it was bound by the collective bargaining agreement to the same extent as [the first company]; and that it was subject to the ordinary obligations of an employer with a union contract to negotiate about changes." Id. at 52-53.

Affirming Hospital San Rafael, in Belmont Concrete, 139 F.3d 304, 308 (1st Cir. 1998), the First Circuit found alter ego status where Belmont Concrete Corporation signed a CBA with the Massachusetts Carpenter's Union and then went out of business, owing the Fund contributions.  The court found that another company called Algar, founded two years before Belmont, could be held liable for Belmont's delinquent contributions as an alter ego.  In this case, the First Circuit focused on the continuity of ownership, noting that family members owned both companies and the owners of the nonsignatory had little responsibility or control over the

6

management of that company. The Court also noted the fact that the two companies shared employees, supervisors and management. Belmont made use of Algar's equipment through an informal leasing agreement although no documentation of the agreement existed. Belmont also shared office space with Algar. Based on this evidence, the Court found that the two companies were alter egos, noting that anti-union animus was not essential to a finding of alter ego status. Id. at 309. This case is different from the typical alter ego scenario because the non-union company was formed before the union company. The fact that the union company went out of business and then essentially transferred work back to the non-union company seems to indicate the use of corporate structure to avoid labor law obligations.

Another First Circuit case, Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, 343 F.3d 18 (1st Cir. 2003), may help to reconcile these differing approaches. In A.A. Bldg. Erectors, the First Circuit held that a union company created after a non-union company was not the alter ego of the non-union company. In discussing the alter ego doctrine, the Court stated "the doctrine is a *tool* to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield." Since the union company in that case had been created after the non-union company, the court found no "preexisting labor obligations" and therefore no inequity as a result of the creation of the second company. Id at 21-22. The Court focused on whether the second company's formation had the *effect* of allowing the first company to avoid pre-existing labor obligations rather than whether the *intent* of the first company in creating a double-breasted operation was to avoid labor obligations. In both Hospital San Rafael and C.E.K., the creation of a double-breasted operation had the effect of allowing one company to avoid the other company's already existing labor obligations.

Other circuits have made a similar distinction between the avoidance of preexisting labor obligations and creation of future labor obligations through a new union company. For example, in S. California Painters & Allied Trades, Dist. Council No. 36 v. Rodin & Co., 558 F.3d 1028 (9th Cir. 2009), the Ninth Circuit did not find alter ego status where a non-union painting company worked to facilitate the creation of a union company. In this case, the Court stated that "alter ego status applies if two entities function as a single employer and the non-union entity is 'being used in a sham effort to avoid collective bargaining obligations... rather than for the

CONFIDENTIAL

MLDC00000001571

pursuit of legitimate business objectives untainted by 'union animus'" Id. at 1032. The Court emphasized the "sham" nature of an alter ego enterprise as a vehicle for the avoidance of labor obligations. Id. The Ninth Circuit wrote, "Because the alter ego doctrine prevents union employers from avoiding collective bargaining obligations, it does not apply in the "reverse" where a non-union employer creates a union company because the non-union employer has no collective bargaining obligations to avoid." Id. at 1033. The Court differentiated between a union company opening a non-union company seeking to "avoid *existing* collective bargaining obligations" and a union company opening a non-union company seeking "to avoid *future* collective bargaining obligations." Id. at 1028. In this case, some exchange of workers had occurred between the two companies, but the Court did not find this determinative in its alter ego analysis. In Belmont Concrete, the non-union company was formed before the union company, but the union company went out of business and the non-union company remained. The fact that the union company closed owing the Funds contributions meant that the non-union company could both escape liability for those contributions and be used to take over new projects while avoiding any labor law obligations. It is less clear whether the Court would have found alter ego status had both companies remained open. The closing of the union company without payment of contributions seemed to have the effect of creating the kind of "sham" operation and strategic avoidance that the alter ego doctrine seeks to combat.

In contrast to the Ninth Circuit where the sham nature of the non-union enterprise is emphasized, the Sixth Circuit has held that "an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status." Trustees of Detroit Carpenters Fringe Benefit Funds v. Indus. Contracting, LLC, 581 F.3d 313, 318 (6th Cir. 2009), *citing* NLRB v. Allcoast Transfer, Inc., 780 F.2d 576 (6th Cir.1986). In Indus. Contracting, the Sixth Circuit differentiated between the intended *"purpose"* of the alter ego doctrine — preventing employers from evading their obligations under a CBA by changing their corporate form— and the Sixth Circuit's *test for determining whether it should be applied.* 581 F.3d at 319. The Court held that the collective bargaining agreement bound the nonsignatory employer as an alter ego of the signatory employer given a record "replete with evidence of entanglement" between the two companies. Id. The Court did not find the lack of direct evidence of a purposeful effort to evade union obligations dispositive. Id.

CONFIDENTIAL                                                                 MLDC00000001572

In addition to other circuits, precedent of the National Labor Relations Board provides further insight into the alter ego doctrine. In determining alter ego status, the Board considers "whether two entities have substantially identical ownership, management and supervision, business purpose, operation, customers, equipment." US Reinforcing, Inc., 350 NLRB 404, 404 (2007). "The Board also looks to 'whether the purpose behind the creation of the alleged alter ego was legitimate or whether instead, its purpose was to evade responsibilities under the Act." Id., *quoting* Liberty Source W, 344 NLRB 1127, 1136, *quoting* Fugazy Continental Corp., 265 NLRB 1301, 1302 (1982). "No single one among these factors is determinative, and not all of the indicia need be present for the Board to make a finding of alter-ego status." Id., *quoting* Liberty Source W, 344 NLRB 1127, 1136 *and citing* Standard Commercial Cartage, Inc., 330 NLRB 11, 13 (1999); MIS, Inc., 289 NLRB 491, 492 (1988).

Again, the weight given to evidence of anti-union animus or evidence of an effort to evade union obligations is less than clear. In Alexander Painting, Inc., 344 NLRB 1346, the Board noted that "motive is not necessary for finding alter ego status" and that although a relevant factor, "the question of motive is not controlling." On the other hand, these factors appear to be almost determinative. For example, in A.D. Conner Inc., 375 NLRB No. 154 (2011), the Board found that a non-union company and a union company became alter egos only after the union company ceased its business operations. The Board found that the unlawful alter ego status developed when closure of the union company resulted in a funneling of previously union work over to the non-union company. Id. at 30-31. Before the union company closed, the Board found nothing unlawful about the double-breasted operation. Id. at 29. In other words, only when the non-union company was used as a vehicle to avoid preexisting labor obligations did the operation become unlawful. In Fugazy Continental Corp., 265 NLRB 1301, 1303 (1982), the Board wrote, "Fugazy's animus toward the statutory rights of its employees is demonstrated on nearly every page of this record and is among the factors which tip the balance in favor of our finding of *alter ego*."

I.      Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc.

9

Applying these factors to Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc., there is substantial structural evidence to support a finding that these two companies are alter egos. Absolute Environmental, which had been a non-Union company since its incorporation in 2004, signed a CBA with the Union in January 2010. In April 2010, its principals (through their wives) incorporated Absolute Environmental Contractors, Inc. to operate as a non-union company. The companies share a continuity of ownership and have similarity in relation to management, business purpose, operation, equipment, customers, and supervision. The companies also share employees. On the other hand, the presence of anti-union animus is less clear. The companies claim to have fully disclosed to the Union their intention to run a double-breasted operation and when Absolute Environmental signed with the Union, it explicitly exempted jobs that had already been bid as "open shop." The case law is less clear as to whether such a transparent attempt to maintain a union company and a non-union company will result an alter ego relationship. Cf. Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d 38, 41 (D.D.C. 2006); A-1 Fire Protection, 250 NLRB 217 (1980); NLRB v. Hospital San Rafael, 42 F.3d 45, 50 (1st Cir. 1994).

*A. Continuity of ownership*

Absolute Environmental, Inc. registered to do business in Massachusetts in 2004. The company is co-owned by Gary McCaffrey and Richard Quinn. Absolute Environmental Contractors, Inc. became incorporated in 2010. This company is co-owned by Elaine McCaffrey and Susan Quinn, the wives of Gary McCaffrey and Richard Quinn. A continuity of ownership or substantially identical ownership has been found where "the original company and the newly formed company are owned by members of the same family." Deer Creek Electric Inc., 362 NLRB No. 171 (Aug. 17, 2015), see also, Belmont Concrete Corp., 139 F.3d at 308. Although a familial connection between the company owners is not dispositive, its existence may point to a less than arms length relationship between the companies. Id. In this case, it appears that Elaine McCaffrey and Susan Quinn have no actual involvement in the running of their company's operations. Gary McCaffrey and Richard Quinn control operations of both companies. Given the close connection between the owners of the two companies, a court would likely find that they share a continuity of ownership or substantially identical ownership.

10

MLDC00000001574

### B. *Similar Management and Supervision*

Much like the ownership of the companies, there is substantial evidence that these companies have similar management. Gary McCaffrey serves as the President, Treasurer and Secretary for Absolute Environmental, Inc. Richard Quinn is a corporate office. In 2010, Elaine McCaffrey and Susan Quinn became the directors of Absolute Environmental Contractors, Inc. Currently, Susan Quinn is the President of Absolute Environmental Contractors, Inc and Elaine McCaffrey is the Company's Treasurer. Neither Elaine McCaffrey nor Susan Quinn appears to have any actual involvement in the management of their company.  Instead, Gary McCaffrey and Richard Quinn manage the day-to-day business of both companies.

Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. also share the same supervisors.  There is no evidence of any clear separation between supervisors that worked for Absolute Environmental, Inc or for Absolute Environmental Contractors, Inc. Workers often reported to the same supervisors whether they were assigned to a job at one company or the other. For example, laborer Jean C. Jiminez was recruited to be an employee by Dana Stark, a supervisor for both companies.

### C. *Similar Business Purpose and Operation*

Both Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. are companies engaged in asbestos and mold abatement. Both companies work to remove toxic materials and other contaminates. They share a common business purpose and perform work in the same manner.  There does not seem to be any sort of unique operation performed by one company, but not the other. The companies share the same website. The Absolute Environmental website lists an email address: nhoffice@absoluteevir.com.  Absolute Environmental Contractor lists its email on the State of Connecticut eLicensing Website as maoffice@absoluteenvir.com.

### D. *Similar Equipment*

Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. share the same equipment. The address listed as the office space for Absolute Environmental Contractors, Inc. is actually the office of Attorney William Barron, the Company's Secretary.  This address has no warehouse or evidence of supplies or trucks.  Instead, employees for both companies

11

CONFIDENTIAL

MLDC00000001575

report to the address listed for Absolute Environmental, Inc. to obtain materials and equipment to perform their work. In C.E.K., 921 F.2d at 352 and Belmont Concrete, 139 F.3d at 309, the Courts found substantially identical equipment to be a factor supporting alter ego status. In contrast, Hospital San Rafael, Inc., the Court noted that "little of the equipment had been transferred," still found alter ego status. 42 F.3d at 52,

### E. Similar Customers

The customers of Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. appear different, although both companies perform the same type of work for their customers. In Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc., 343 F.3d 18 (1st Cir. 2003), a non-union company formed a second union company with the purpose of satisfying customers who preferred union workers. In contrast to A.A. Bldg. Erectors, here, the union company existed first (albeit after 6 years of operating non-union) and the non-union company was formed second. As discussed above, this differing order may be significant since in A.A. Bldg. Erectors, the court emphasized that the creation of the second, union company had not allowed the first, non-union company to avoid "a *preexisting* labor obligation" since no obligation had existed prior to the formation of the union company. Id. at 21. It may be that the order of these two seemingly similar efforts to expand customer base have significantly different results in alter ego analysis. Although, again, if the creation of the non-union company was open and made to essentially maintain the old maintain the old non-union customary base, this may preclude a finding of an attempt to evade established union obligations. Here, the incorporation of the second company occurred only three months after the unionization of the first company.

### F. Shared Employees

Shared employees may support a finding of alter ego status. Many, if not all, of the same laborers work interchangeably for Absolute Environmental and Absolute Environmental Contractors. In a number of the NLRB cases where no alter ego or single employer status is found, the Board highlights a lack of interchange between employees, indicating that the reverse may support an alter ego status finding. See e.g. Gerace Construction, 193 NLRB 645, 646 ("While some Helger employees previously worked for Gerace on occasion, there is no

12

interchange of employees."); Frank N. Smith Associates, 194 NLRB 212 (1971) ("employees do not work back and forth nor do they work together on the same project"). In Belmont Concrete, the First Circuit pointed to the fact that the two companies in question shared a large number of employees as an indication that the two entities were alter egos. 139 F.3d at 309. In the Eighth Circuit, there even appears to be a tendency to include "employees" in the list of factors for consideration alongside ownership, management, supervision, etc. See e.g. Greater St. Louis Const. Laborers Welfare Fund v. Mertens Plumbing & Mech., Inc., 552 F. Supp. 2d 952, 955 (E.D. Mo. 2007); Greater St. Louis Const., Laborers Welfare Fund v. Kirkwood Masonry, Inc., No. 4:12 CV 694 CDP, 2014 WL 1048597, at *2 (E.D. Mo. Mar. 14, 2014).

Although certainly a factor to be considered in determining alter ego status, it is unclear how much weight a court will give to the interchange of employees. In Rodin, the Ninth Circuit case mentioned above, the Court addressed allegations that employees from the two companies worked together or overlapped on several jobs. 558 F.3d at 1030. In that case, the Court noted that some workers who worked for one company also worked for the other. However, the Court did not find the exchange of some employees sufficient to find alter ego status. In US Reinforcing, Inc., 350 NLRB 404, the NLRB declined to find alter ego status despite the fact that most of non-union successor company's employees had worked for the union company.

It is less clear and more research may be required as to how a court would treat the exchange of essentially an entire workforce between two companies as seems to be the case with Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. Most of the cases address the issue of the interchange of only a few employees or the transfer of employees to a successor.

G. *Anti-union Animus*

While the other factors for alter ego status seems relatively simple to establish, the existence of anti-union animus in this case and its role in a final finding are much less clear. Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc. contend that the Union was fully aware of the existence of both companies and that the double-breasted nature of their operation has been entirely transparent. Double-breasted operations in the construction

13

   MLDC00000001577

industry have not been found to be inherently illegal. See C.E.K., 921 F.2d at fn3, *citing* A. Dariano & Sons, Inc. v. District Council of Painters No. 33, 869 F.2d 514, 517 (9th Cir. 1989). The companies claim that the second company was created to allow for their continuing ability to bid on non-union projects and to remain competitive. The companies assert that these projects are not projects that the union-company could have obtained and that the Union is no worse off. Through this complete disclosure, the companies assert that they have demonstrated no anti-union animus and have not sought to avoid any labor law obligations through a "sham" operation.

The order of their creation, however, makes these two companies particularly suspect. The creation of a non-union company after the creation of a union company conforms to the classic alter ego scenario. In contrast to the company in A.A. Bldg. Erector case, the first company, Absolute Environmental, Inc., did have clear, preexisting labor obligations. By creating a second, non-union company, the first company gained the ability to move workers over the non-union company for non-union projects and avoid obligations to pay union wages or contributions.

Although some courts have found that disclosure to the Union of a double-breasted operation helps avoid the possibility of alter ego status, these cases typically involve fact patterns where the non-union company preexisted the union company. For example, in Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d 38, 41 (D.D.C. 2006), a non-union contractor formed a separate union company to provide an all-union workforce to perform certain jobs. The non-union contractor would contract to the union company when union workers were requested. The owner of both companies disclosed at all the times the fact that he ran a double-breasted operation and made this clear to the Union before entering into a CBA. Here, the companies similarly assert that they disclose the existence of a double-breasted enterprise to the Union. The companies may argue that the Union gave no sign of protest upon hearing of the relationship between Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc..

It is unclear what role the Union's acquiescence may play in a finding of alter ego status and whether the Union must ultimately be "worse off" for alter ego status to be found. In InterGen N.V. v. Grina, 344 F.3d 134, 148 (1st Cir. 2003), the First Circuit wrote, "The overarching principle, however, is that the corporate form may be disregarded only if considerations of fairness or public necessity warrant such a step. *Town of Brookline v. Gorsuch,*

CONFIDENTIAL                                                                                        MLDC00000001578

667 F.2d 215, 221 (1st Cir.1981)." In A.A. Bldg. Erector, in declining to find alter ego status, the First Circuit noted that there was no "evidence that A.A. Building deceived the [Union] about its structure, ownership, relationship with Kalwall, or the fact that Kalwall regularly contracts with non-unionized installers." 343 F.3d at 21. The Court also found that there was no indication that the relationship between the two companies had changed or "caused the [Union] to receive less than that for which it bargained." Since alter ego status derives from an equitable doctrine, courts seem to consider whether some sort of corporate change actually put the union in an inferior position. In A-1 Fire Protection, 250 NLRB 217, the NLRB found that two companies were a single enterprise, but declined to impose contractual liability on the non-union company because of apparent acquiescence by the Union. The Board found that although the Union initially "grudgingly" assented to the double-breasted operation, it offered further assent by not demanding an expansion of the bargaining unit to the employees of the non-union company during subsequent contract negotiation. This acceptance of the company's dual operation precluded it from asserting a violation of Section 8(a)(5) of NLRA for transferring work from the union company to the non-union company.

    In this case, the Fund will likely need to demonstrate that the creation of the double-breasted operation ultimately caused the Union to receive less than the CBA promised and that the Union did not consent to these changes. Here, unlike in A.A. Bldg. Erector, the first company had prior labor obligations when the second company was formed. However, these obligations only had been in effect for a short period of time (approximately 3 months). The company claims to have given the Union notice at the time of signing the CBA of its intention to run a double-breasted operation. The court may see the delay in incorporating the non-union company as a mere bureaucratic error. To overcome this, the Fund will need to show that the creation of the second company negatively impacted the Union's rights under the CBA and that equity demands that the two companies be treated as alter egos.

II.    AQE, Inc. and Air Quality Experts, Inc.

    Although much overlap exists between AQE, Inc. and Air Quality Experts, Inc., the circumstances surrounding the founding of these two companies makes it less likely that a court will find that they share alter ego status. The two companies do have continuity of ownership,

CONFIDENTIAL

MLDC00000001579

similarity with regard to management, business purpose, operation, equipment, customers and employees. However, the non-union company existed before the union company was founded and a court may find that the formation of the second company did not allow the first to avoid already existing labor obligations. This potential lack of anti-union animus might make it more difficult to argue that the Union was somehow worse off due to the creation of the second company. Since alter ego status is an equitable standard, the Fund will need to establish some sort of policy consideration that favors a finding of alter ego status. See InterGen N.V. v. Grina, 344 F.3d 134, 149-50 (1st Cir. 2003).

### A. Continuity of ownership

The owner of Air Quality Experts, Inc. is Christopher Thompson.  He is the husband of the owner of AQE, Inc., Kimberly Thompson.  As mentioned above, where the first company and the second company are owned by members of the same family, a continuity of ownership is often found. See Deer Creek Electric Inc., 362 NLRB No. 171 (Aug. 17, 2015).

### B. Similar Management and Supervision

Air Quality Experts. Inc. and AQE, Inc. have shared the same corporate officers. Christopher Thompson is Air Quality Experts' President and Treasurer and Kimberly Thompson is Air Quality Experts' Assistant Clerk.  Kimberly Thompson is the President of AQE and Christopher Thompson is the Vice President. There is also evidence that the same supervisors supervise jobs for both companies. The companies also share the same clerical workers.

### C. Business Purpose and Operation

According to their 2015 Annual Reports filed with the Commonwealth of Massachusetts Secretary of State, both companies are in the business of Asbestos Removal Services. Both companies appear to be operated out of 23 Hall Farm Road, Atkinson, New Hampshire, the principal office listed for Air Quality Experts, Inc.  This is the location where employees pick up their paychecks when their checks are not delivered to the worksite. The principal office listed for AQE, Inc. is actually the home address of Christopher and Kimberly Thompson.

### D. Similar Equipment

16

MLDC00000001580

Trucks, equipment and supplies for both companies are stored at 23 Hall Farm Road, Atkinson, New Hampshire.  There is no evidence that the companies have separate equipment. The address listed as the principal office for AQE is actually the home address of Christopher and Kimberly Thompson.  This address has no attached warehouse and no evidence of trucks or supplies leaving from or reporting to that location.

### E.  Similar Customers

AQE and Air Quality Experts service different customers but in the same general region on the same general type of project.  See e.g. C.E.K., 921 F.2d 350 (1st Cir. 1990), but cf. A.A. Bldg. Erector, 343 F.3d 18 (1st Cir. 2003).

### F.  Shared Employees

It appears that AQE and Air Quality Experts use many, if not all, of their employees interchangeably.[1] For example, David M. Ortega believed that he was working for the union company, AQE, but when he went to work on a job at the Hanscomb Air Force base, he was told that the job was being paid at the lower rate and without contributions. The companies used two different colored checks to differentiate between payment for union and non-union jobs. Employees for both companies performed the same kind of work.

### G.  Anti-union Animus

In contrast to Absolute Environmental, Inc. and Absolute Environmental Contractors, Inc., the non-union company (Air Quality Experts) predated the union company in this case, having been incorporated since 1987.  On August 18, 2005, Air Quality Experts signed a Project Agreement with the Union for the Worcester County Hospital job. The Funds sent Air Quality Experts a letter stating that it would accept contributions for this job only and that Air Quality Experts would be considered a "non-union contractor on all other work."  On September 6, 2005, Air Quality Experts signed a second Project Agreement for the Woburn High School job and received a similar letter from the funds stating that Air Quality Experts would be considered a "non-union contractor on all other work."

---

[1] According to the DOL, the two companies have, on a least one occasion, listed the same laborer working on the same job at the University of Massachusetts, on the same day, on their respective daily time sheets. However, according to the University of Massachusetts, only the non-union entity was on the site.

CONFIDENTIAL

MLDC00000001581

On September 22, 2005, four months after incorporating, AQE signed the Acceptance of Agreement and Declaration of Trust, thereby becoming a party to the Massachusetts State-Wide Wrecking and Environmental Remediation Agreement. Nine years later, on September 4, 2014, Air Quality Experts also agreed to be bound by the Acceptance of Agreement and Declaration of Trust.

This case is more similar to A.A. Bldg. Erector than Absolute Environmental because the union company was formed second. Air Quality Experts had signed limited Project Agreements, but was not a party to a CBA when AQE was created. Courts seem less inclined to find what has been termed a "reverse" alter ego claim. See Rodin 558 F.3d at 1032. In a "reverse" alter ego situation, a non-union employer allegedly opens a union company to avoid *future* collective bargaining obligations. Id. In contrast, in a traditional alter ego claim, the union employer opens a non-union shop to avoid *existing* collective bargaining obligations. Id.

Here, the Fund will need to show that policy considerations and equity warrant treatment of these two companies as alter egos. InterGen, 344 F.3d at 148. As the First Circuit wrote in InterGen, "Common ownership and common management, without more, are insufficient to override corporate separateness and pave the way for alter ego liability." Id. at 149. As noted before, "corporate form may be disregarded only if considerations of fairness or public necessity warrant such a step." Id. at 148. In this case, there is little evidence that the Union was worse off because of the creation of the second union company. By creating AQE, more projects became union jobs. Air Quality Experts did not avoid any preexisting labor obligations, but instead created a company to take on new labor obligations.

Additionally, there is no evidence that Air Quality Experts or AQE used the double-breasted operation to hide the nature of their business. Similar to Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d 38, 41 (D.D.C. 2006), discussed above, the companies state that they openly disclosed their structure to the Union and took no efforts to conceal their operation. Unlike Belmont Concrete, the union company did not then become defunct and transfer back its projects to the non-union company. In fact, the non-union company ultimately signed its own CBA and became union as well. Here, there is no evidence of anti-union animus or even effective skirting of labor law obligations. For this reason, a court is less likely to find that equity requires treatment of the two companies as alter egos.

18

CONFIDENTIAL

MLDC00000001582

One factor supporting alter ego status that may require further investigation is the crossover of workers between the two companies.  Air Quality Experts and AQE share many of the same employees. As described above, some employees were not even aware which company had hired them for a specific job.  Common employees are certainly a factor in establishing alter ego status.   As mentioned in the discussion of Absolute Environmental and Absolute Environmental Contractors, the First Circuit has pointed to shared employees as one indicator of alter ego status. See Belmont Concrete, 139 F.3d at 309. However, in other cases, the fact that some employees were shared was not enough for alter ego status to be found. See e.g. Rodin, 558 F.3d at 1030. It is unclear how much a shared workforce may be taken into account in finding alter ego status.  The lack of full disclosure to employees signing up for jobs and the overlap on jobsites might provide the equitable grounds for finding alter ego status. However, the court would likely remain skeptical about applying alter ego status in a situation where the union company followed the non-union company and no clear evasion of labor obligations has occurred.

CONFIDENTIAL

MLDC00000001583