UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARRY C. McANARNEY, as he is EXECUTIVE DIRECTOR, MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, MASSACHUSETTS LABORERS' PENSION FUND and MASSACHUSETTS LABORERS' ANNUITY FUND; JAMES V. MERLONI, JR., as he is ADMINISTRATOR, NEW ENGLAND LABORERS' TRAINING TRUST FUND; and JOSEPH BONFIGLIO, as he is TRUSTEE, MASSACHUSETTS LABORERS' LEGAL SERVICES FUND,<br>    Plaintiffs,<br><br>vs.<br><br>ABSOLUTE ENVIRONMENTAL, INC. and ABSOLUTE ENVIRONMENTAL CONTRACTORS, INC.,<br>    Defendants. | C.A. No. 15-12985-NMG |

**PLAINTIFFS' OPPOSITION TO DEFEDANTS' "EMERGENCY" MOTION TO COMPEL THE PRODUCTION OF (i) ATTORNEY-CLIENT COMMUNICATIONS BASED ON SUBJECT MATTER WAIVER AND (ii) IMPROPERLY WITHHELD ELECTRONIC DISCOVERY**

I. Introduction

  The Defendants are two asbestos abatement companies that according to the Amended Complaint unlawfully operated as alter egos and/or a single employer, and as a result failed to pay employee benefit contributions owed under a collective bargaining agreement.

  Now, primarily relying upon dozens and dozens of pages of documents that unquestionably have nothing to do with this case, Defendants argue that they are entitled to a broad disclosure of attorney-client documents related to the subject matter of those documents. The motion should be denied, as Defendants have declined to engage the subject most inconvenient to their argument, namely relevance. Beyond failing to address relevance, the

Defendants misrepresent the doctrine of extrajudicial disclosures, and are seeking discovery that is vastly disproportional to the needs of this case.

This motion does not exist in isolation. Effectively before the Court for hearing on July 10, 2018, is Plaintiffs' request to refine the parameters of this lawsuit within appropriate bounds. It is the Plaintiffs' strongly held view, as expressed in the Motion for Protective Order ("MPO") (Doc. 71) and in this opposition, that Defendants seek to undertake lengthy and burdensome discovery on matters that have no conceivable relevance to this case. Indeed, this motion to compel is a symptom of this very problem. As explained in the MPO, and as evidenced by their motion to compel, the Defendants seek to obscure the legal issues that are truly central to this case and are trying to make this case about something else altogether.

This motion should be denied, and the Motion for Protective Order granted.

II. <u>Legal Arguments</u>

A. <u>The Material Sought Is Not Relevant</u>

In civil discovery, only information "that is <u>relevant</u> to any party's claim or defense <u>and proportional</u> to the needs of the case" is discoverable. Fed. R. Civ. P. 26(b)(1) (emphasis added).[1] This follows a change to the Federal Rules of Civil Procedure in 2015. "The test going forward is whether evidence is 'relevant to any party's claim or defense,' not whether it is

---

[1] This is the full text of Fed. R. Civ. P. 26(b)(1): "Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable."

'reasonably calculated to lead to admissible evidence.'" In re Bard IVC Filters Prod. Liab. Litig., 317 F.R.D. 562, 564 (D. Ariz. 2016).

Although Defendants purport to summarize the parties' claims and defenses "to assist the Court in understanding the relevance of the attorney-client communications sought here," they do not actually explain why they believe the material sought is relevant, thus leaving Plaintiffs and this Court guessing as to their position. However, Plaintiffs agree that to resolve the motion, the Court needs to know what this case is properly about, as well as what it is not about.

This case is about whether a non-union company, Absolute Environmental Contractors, Inc. ("AEC"), unlawfully failed to make employee benefit contributions because it is either an alter ego of and/or single employer with a union signatory company, Absolute Environmental, Inc. ("AE"). Only if AEC is an alter ego and/or single employer with AE are benefit contributions owed.

To determine whether one company is the alter ego of another, courts consider "continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus - i.e. 'whether the alleged alter ego entity was created and maintained in order to avoid labor obligations.'" Mass. Carpenters Central Collection Agency v. Belmont Concrete Corporation, 139 F.3d 304, 308 (1st Cir. 1998), quoting NLRB v. Hospital San Rafael, 42 F.3d 45, 50 (1st Cir. 1994) and C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 354 (1st Cir. 1990). Although all of these factors may be considered, "no one factor is controlling and all need not be present to support a finding of alter ego status…In particular, there is no rule that wrongful motive is an essential element of finding of alter ego status." Id., citing C.E.K., 921 F.2d at 354.

To establish that AEC and AC are a single employer, the court must consider four factors: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. Radio & Television Broadcast Technicians Local Union 1264 v. Broad. Serv. of Mobile Inc., 380 U.S. 255, 256 (1966). "No one of these factors is controlling, nor need all of them be present. Single employer status ultimately depends on 'all the circumstances of the case' and is marked by an absence of an 'arm's length relationship found among unintegrated companies.'" Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 25 (1st Cir. 1983). "A finding of single employer status does not mean that one business is bound by a union contract signed by another, absent an additional finding that the employees of each constitute a single appropriate bargaining unit." C.E.K., 921 F.2d at 353–54.

This case is not about the Defendants' defenses. See Defs. Memo of Law, pgs. 6-8. Plaintiffs' pending Motion for Protective Order ("MPO") provides the detail. To summarize, whether a union official (Thomas Troy)[2] said something that caused AE to sign a CBA is not

---

[2] Throughout its briefing, Defendants utter the false mantra that Mr. Troy is the Funds' agent. He is not. The courts have repeatedly recognized that a business manager of a labor union is not an agent of a Taft-Hartley benefit fund, and even where a union official serves as a fund trustee, he is not an agent of the Fund when acting in his union capacity. Pegram v. Herdrich, 530 U.S. 211, 225 (2000) ("trustee under ERISA may wear different hats… [but] the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions"); Voyk v. Bhd. of Locomotive Engineers, 198 F.3d 599, 605 (6th Cir. 1999) (union not acting in fiduciary capacity); NLRB v. Amax Coal Co., 453 U.S. 322, 329–30 (1981). When Mr. Troy is bargaining a CBA, he is not acting as a fiduciary or agent of the Funds. Defendants have offered no contrary evidence. Their failure to acknowledge this reality does not change it.

As clarifying context, Plaintiffs add that unions and employers negotiate collective bargaining agreements that call for these multiemployer benefit plans to be established. See Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California, 508 U.S. 602, 605 (1993) ("A pension plan like the one in issue, to which more than one employer contributes, is characteristically maintained to fulfill the terms of collective-bargaining agreements. The contributions made by employers participating in such a multiemployer plan are pooled in a general fund available to pay any benefit obligation of the plan.") Pursuant to 29 U.S.C. § 186(c)(5), these benefits are then administered by a separately established fund, like those at

relevant to this suit. See, e.g., Operating Engineers' Tr. Funds v. Kinores, 902 F. Supp. 1201, 1206 (D. Haw. 1995) ("The Court can appreciate the frustration of the employer when the union agent says one thing but the law is to the contrary. Under the prevailing law, however, that Kinores may have been misled by the statements of Local 3 representative, Nathan Yasso does not relieve him of his obligation to the employee benefit trusts."). Nor is the question of what the Funds' agents said or did after the signing of the CBA relevant.[3] See Operating Engineers Local 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1056 (6th Cir. 2015) ("An employer's failure to review the collective bargaining agreements and related plan documents defeats any claim of ignorance, and the defendants' reliance on the Funds' words and actions during previous audits, in the face of the explicit terms of the agreements establishing their duty to contribute to the Funds, cannot be described as justifiable.").[4] Nor is this case about the Funds' enforcement actions against companies other than the Defendants.

Against that back drop, Defendants now seek voluminous documents that are shielded by attorney-client privilege. And yet, nowhere in their Memorandum of Law do they argue why these documents are relevant. They simply offer case background and jump into an argument about waiver, without even attempting to draw a connection between the two. As explained above, the facts relevant to this case concern <u>the conduct of the Defendants</u>. For example, the

---

issue here. Unlike the collective bargaining process, the Funds are governed by ERISA. Therefore, the Funds do not (and cannot) collectively bargain the CBA; rather, their role is to enforce it with respect to employee benefit contribution obligations. See, e.g., Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364 (1984) (addressing implication of an employee benefit fund's role as a third-party beneficiary to a CBA in terms of how a benefit fund may enforce a CBA; benefit fund is not a party to the CBA).

[3] As explained below in Footnotes 7 and 8, Absolute's recitation of the facts on page 8 of its Memorandum is flawed.

[4] Plaintiffs refer the Court to its MPO and incorporate its arguments into this memorandum by reference. Doc. 71. That motion is now pending and scheduled to be heard concurrently with this motion on July 10, 2018.

relevant evidence concerns whether the companies have common operations, share equipment, addresses and workers, have common ownership, how many hours employees have worked, and on what jobs, and under whose supervision, etc. These are examples of the factors identified above that relate to the alter ego and simple employer theories before the Court. That is the proper scope of discovery in this case.

And yet, this motion to compel does not seek <u>any</u> evidence relevant to the issues in dispute. Indeed, Plaintiffs cannot conceive how what Plaintiffs' counsel communicated to their client or vice versa has any bearing at all on the question of alter ego or single employer. These communications largely are made after the conduct at issue, are legal opinions and other inadmissible evidence, and will not make it either "more or less probable" that AEC is an alter ego and/or single employer of AE. Fed. R. Evid. 401(a).

Therefore, because the Defendants cannot establish the relevance of the requested documents – indeed, they do not even try – the Motion to Compel must be denied on that basis alone. <u>See</u> <u>United Therapeutics Corp. v. Watson Labs., Inc.</u>, 200 F. Supp. 3d 272, 274 (D. Mass. 2016) (motion to compel denied where party advancing motion "has not met its burden of establishing that the documents it seeks are relevant to the claims and defenses" in the case).

    B. <u>All of the Alleged Disclosure Are Extrajudicial And Do Not Trigger the Broad Subject-Matter Waiver That Defendants Seek</u>

A particularly frustrating aspect of Defendants' motion is their argument that the disclosed material somehow triggers a subject-matter waiver beyond the documents submitted. And yet, the Defendants acknowledge (albeit in a footnote, no. 11 on page 16) that the First Circuit has held that "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter." <u>In re Keeper</u>

6

of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 24 (1st Cir. 2003). Defendants attempt to avoid this clear doctrine by claiming that "none of the disclosures were made extrajudically." Memo. of Law, pg. 16, n. 11. This claim is contradicted by the cases cited.

In XYZ Corp., the Court held that "[w]here a party has not thrust a partial disclosure into ongoing litigation, fairness concerns neither require nor permit massive breaching of the attorney-client privilege." Id. at 25. In support, the Court cites to In re Grand Jury Proceedings, 219 F.3d 175, 188-89 (2d Cir. 2000) for the proposition, in the First Circuit's words that there is "no broad waiver when disclosure occurred in grand jury testimony and government did not show sufficient prejudice." In other words, documents submitted to a grand jury are extrajudicial.

Moreover, even if the Court were to ignore the First Circuit's conclusion and consider these to be judicial disclosures, they are not judicial disclosures in this case. All of these disclosures are from a different case altogether, one having literally nothing to do with Absolute. The concern the Court identified is one of "fairness because it disables litigants from using the attorney-client privilege as both a sword and a shield. Were the law otherwise, the client could selectively disclose fragments helpful to its cause, entomb other (unhelpful) fragments, and in that way kidnap the truth-seeking process." XYZ Corp., 348 F.3d at 24. Here, the Funds have not used these documents in this litigation, and thus they were neither sword nor shield against Defendants. As a result, these disclosures are covered by the extrajudicial disclosure rule, a rule fundamentally based in fairness. In re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987) ("Applying the fairness doctrine, we hold therefore that the extrajudicial disclosure of an attorney-client communication—one not subsequently used by the client in a judicial

proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication.") It would be disingenuous for Defendants to claim that the Funds were using these disclosures to the disadvantage of Defendants in a case that had nothing to do with them.

    C. <u>Most of the Documents Submitted With the Motion Are Not Material To This Case Or The Motion</u>

If the Court were to conclude that there was plausibly something relevant in attorney-client materials, it would then have to scrutinize the 16 exhibits with which the Defendants have larded the record. The Court will quickly see that the vast majority of the more than 200 pages across those exhibits have either no connection to the question of attorney-client privilege, no connection to this case at all, or have only a fleeting reference to the matters in dispute. Once the court strips away the Defendants' documentary surplusage, it will see how little was submitted in support of their motion. Below is a summary of the various categories of those documents, along with Plaintiffs' responses.

**Documents Wholly Unrelated to this Case**

- <u>Exhibit B (Transcript of Sentencing in AQE Matter[5])</u>: This has no connection to this case and there is no relevance to this dispute. It wholly concerns another matter altogether in which Defendants' counsel was then counsel for the unrelated defendants. In footnote 5 of its Memorandum (pg. 4), Defendants take issue with the fact that "U.S. Attorney's investigation is proceeding despite Chief Judge Saris' admonition to that office in a near identical case." Plaintiffs do not have a position on the appropriateness of a criminal investigation, except to say it is not relevant to this civil case. However, the fact that Defendants consider it relevant in this civil case and of sufficient importance to argue this in its memorandum raises the specter that Defendants' true purpose with this motion is to gather evidence to defend their clients in the criminal matter. This concern is enhanced by the fact that their rationale for their need for this material in the civil case is so thin. The Plaintiffs note that if Defendants' true motive behind their discovery strategy is to obtain evidence that would exculpate their clients in

---

[5] The AQE Matter was a criminal prosecution of a different company and its owners for failing to pay employee benefit contributions.

8

the ongoing criminal investigation, that would of course be entirely inappropriate. Degen v. United States, 517 U.S. 820, 826 (1996) ("the District Court has its usual authority to manage discovery in a civil suit … Decisions in the Courts of Appeals have sustained protective orders to prevent parties from using civil discovery to evade restrictions on discovery in criminal cases"); United States v. All Funds on Deposit in Suntrust Account No. XXXXXXXX8359, in Name of Gold & Silver Reserve, Inc., 456 F. Supp. 2d 64, 65 (D.D.C. 2006) ("civil discovery may not be used to subvert limitations on discovery in criminal cases, by either the government or by private parties") (citations omitted).

- Exhibit I (Memo from a law student intern): This document is a memo written by a law student and simply summarizes cases. This memo is followed by an email exchange having to do with AQE. Nothing in this exhibit relates to Absolute, and whatever occurred with AQE is not relevant in this case. To the extent that this exhibit includes attorney-client protected material, the subject matter is not Absolute.

- Exhibit J (Various documents related to AQE): Nothing in this exhibit has anything to do with Absolute or this case. To the extent that this exhibit includes attorney-client protected material, the subject concerns AQE, not Absolute. The facts and circumstances in the AQE matter are not relevant here.[6]

- Exhibit L (Email exchange about cash disbursement journals): This has no connection to Absolute. It was an email exchange in 2011 about a different company.

- Exhibit M (brief excerpt of McAnarney testimony): This testimony was offered in the AQE matter and did not concern Absolute at all. Moreover, none of Mr. McAnarney's testimony disclosed an attorney-client communication. Yes, he stated that the basis of his knowledge about double-breasting was from the Funds' attorneys generally, but none of the testimony he offered was specific as to what that advice was. The ambiguity of the testimony makes it impossible to understand what the precise subject of the testimony was. The fact that Mr. McAnarney acknowledged he learned things from lawyers over the years does not effectuate a waiver of privilege. Trustees of Boston Univ. v. Everlight Elecs. Co., 2015 WL 3407555, at *3 (D. Mass. May 27, 2015) ("courts generally agree that not every passing reference to counsel will trigger a waiver of the privilege. For example, indicating the fact or topic of a confidential communication does not waive attorney-client privilege.") (internal citations and quotations omitted).

    Moreover, it was the position of Absolute's counsel in the AQE case that this testimony was not relevant in the AQE matter, and in that case successfully sought to exclude it from trial. As they argued: "Here, Messrs. McAnarney, Gunning, and Welsh offer

---

[6] To the extent that Defendants are seeking attorney-client material related to the AQE matter and/or other matters, that is obviously inappropriate given the lack of relevance. It would also dramatically increase the amount of discovery in this case, and would be excessively disproportional to the needs of the case.

9

nothing but conclusions of law, whether framed as their 'understanding' or otherwise. Those opinions of law are not based upon personal knowledge, but instead upon claimed 'specialized knowledge,' namely of what constitutes 'permissible' double breasting and/or a violation of a CBA. Like other opinions of law, the disclosed opinions of Messrs. McAnarney, Gunning, and Welsh are unhelpful and inadmissible under Rule 701." Doc. 113 (attached hereto as Exhibit A). If Mr. McAnarney's legal opinions were irrelevant and "unhelpful" in that case, the same is true here.

- Exhibit O (Case summary memo): Defendants describe this as an email from counsel to the Funds "analyzing the relevance of a decision of this Court in U.S. v. Thompson." Memo. of Law, pg. 13 (emphasis added). This description is disingenuous. In fact, the email is almost entirely two block quotations from Judge Saris' decision (with descriptive summary headers). The only comment from counsel is "Saris' decision makes for a very interesting read. I think the two most interesting rulings she made were:" That comment cannot be fairly labeled as "analyzing the relevance." In any event, even if this material is attorney-client privileged, it does not concern Absolute and, like so many other exhibits submitted, has no relevance to this case.

- Exhibit P (Email exchanges): This is an email exchange with Mr. Bonfiglio, the business manager of the Mass. Laborers' District Council about negotiations for a collective bargaining agreement. It was not disclosed by Plaintiffs and does not concern Absolute or this case. Moreover, the fact that Mr. Bonfiglio also serves as a trustee on the Funds does not transmute this document into a Funds' document. As the Defendants persistently misunderstand, the Plaintiffs do not negotiate collective bargaining agreements. Instead, pursuant to Section 515 of ERISA, they enforce them with respect to the obligations related to paying employee benefits. See footnote 2, above. Because the subject matter of the communication is not related to Absolute, its disclosure does not trigger production of documents in this case.

**Documents Related to this Case, But Which Have No Bearing on the Motion**

- Exhibit C (Thomas Troy Stipulation): This is a document written by Absolute's counsel shortly before June 18, 2018. There is no apparent reason that Absolute submitted this document with this motion, as it has no bearing on the question of waiver of the attorney-client privilege. However, as argued in Plaintiffs' motion for a protective order, it is evidence of the misguided and expensive path of discovery that Defendants are seeking to take.

- Exhibit D (Email exchange between Mike Tracia, the Funds' auditing director, and Gary Kreiger, then a Funds auditor): Although this concerns Absolute, it does not concern any matter relevant to what is at issue in the lawsuit, as explained above, because it is simply an example of the process undertaken to investigate Defendants' conduct. The manner in which the Funds investigated the Defendants does not affect Defendants' liability. Moreover, this is not an attorney-client communication, and it has no bearing on the

question of attorney-client privilege.[7]

- Exhibit E (Series of form letters from Funds Auditor): Although these at least concern Absolute, they do not concern any matter relevant to what is at issue in the lawsuit, as explained above. Moreover, they have no bearing on the question of attorney-client privilege. They are not arguably attorney-client communications.[8]

- Exhibit F (Letter from U.S. Attorney to Counsel for AQE): This letter is not substantive and submitted only to establish the origin of some of its submissions.

There is no apparent purpose why Defendants included any these documents with their motion. None involve attorney-client communications, and they neither support nor contradict Absolute's argument. Perhaps they were supplied simply to provide some context, although as

---

[7] Although this document is not relevant to the instant motion, Plaintiffs wish to point out that Defendants have misrepresented the email exchange. On page eight of their brief, Defendants claim that this document demonstrates that the Funds "have long had direct knowledge of Defendants' openly operated double-breasted operation and have ratified it." Plaintiffs are simply perplexed about how the Defendants believe this document supports that claim, particularly since it literally does not say that. First, Mr. Kreiger notes that Absolute refused to disclose its cash disbursement journals (this is the meaning of "Cannot look at payables" in Mr. Kreiger's email of 10:19 a.m.). These journals often shed lift on the interrelation between double-breasted companies. Moreover, Mr. Tracia responded with questions to probe the validity and veracity of the claim, to which Mr. Krieger responded, concluding with the skeptical "Say gary mccafrey [sic]." The Funds' investigation obviously continued – leading to this lawsuit – and Mr. Tracia's questions only covered two items, even though the question of alter ego involves more factors. This exhibit not only does not support a claim that the Funds "ratified" Absolute's double-breasting, it indicates quite the opposite.

[8] Defendants also misrepresent these letters. These letters follow an audit of Absolute Environmental, the union signatory. The Funds are not alleging that this company failed to pay benefit contributions for hours worked under the signatory's umbrella. These letters only indicate that the signatory paid contributions for those hours that no one disputes are covered work. The lawsuit is about whether contributions are owed for hours worked under Absolute Contracting, either under a single-employer or alter ego theory (or both). Absolute, incredibly, goes so far as to argue that through these letters that the Funds "did not inform Absolute that the Funds believed Absolute was out of compliance with its pension fund contributions requirements, as the Funds now claim in this lawsuit." Memo of Law, pg. 8. Given that two of the three submitted letters <u>post-dated the filing of the lawsuit</u>, its claim that Funds had not notified Absolute of its position is simply inscrutable.

11

the footnotes in this section indicate, the Defendants failed to provide accurate or fair commentary on these documents. The Court ought to simply disregard them.

### **Documents Which Have Only A Tangential Connection to this Case**

- Exhibit A (Legal memorandum discussing potential claims against Absolute): This document was not provided to Defendants by Plaintiffs. Upon review of Defendants' filing, it appears to have been originally provided to the U.S. Attorney's Office in response to a grand jury subpoena issued to the MLDC. When it was supplied, it was conditioned on a maintenance of attorney-client privilege. As Attorney William Kettlewell of Hogan Lovells wrote on September 6, 2017, "The submission of this information does not waive, nor is it intended to waive, any rights, privileges, or immunities of the Massachusetts Laborers' District Council with respect to this matter, including any applicable attorney-client, work product, or other privilege or immunity." See attached hereto as Exhibit B. The government apparently raised an objection to this reservation. See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 27 (1st Cir. 2003) ("XYZ reasonably interpreted the government's silence as an acceptance of the reservations" regarding privilege.)

    Mr. Kettlewell's letter also indicates that the documents were apparently obtained from the email account for Joseph Bonfiglio, among others. Mr. Bonfiglio is the Business Manager of the MLDC, and he is also a trustee of the Funds. The cover email from Attorney Anne Sills indicates that this was sent to Mr. Bonfiglio in his capacity as a funds trustee. (All other recipients of the email are either Funds agents or attorneys). Therefore, this email was disclosed on behalf of the Union and without prior consultation with the Funds. This does not lead to a waiver of attorney-client privilege by the Funds, as this disclosure was not authorized by the Funds. The Funds' object to its disclosure on this ground. See Restatement (Third) of the Law Governing Lawyers § 73 (2000) (comment) ("The privilege for organizational clients can be asserted and waived only by a responsible person acting for the organization for this purpose.") The Funds assert it should not be considered in the context of this motion. Indeed, the Funds objected and requested that these materials be filed under seal, but Defendants refused to do so.

- Exhibit G (Memo from counsel to MLBF's Delinquency Committee): The vast majority of this document has no connection to Absolute or this case. The only reference to Absolute (top of page 2) says: "Based on our research, the Funds have a solid basis on which to continue investigating the potential alter ego relationships between Absolute Environmental, Inc./Absolute Environmental Contractors , Inc. ….In [this case], the non-union company was formed after the union company. The non-union entity Absolute Environmental's registered place of business is a residential address belonging to an attorney, which indicates that the entity does not actually operate out of that address." That memo is more than five years old. Since then, the Funds have conducted further investigation, brought this lawsuit, and amended it. Voluminous discovery has followed. The fact that the Funds then believed they had grounds to "continue

investigating" is not probative of anything, now that suit has been filed, and the Plaintiffs have responded to ample amounts of discovery as to the basis of the suit. The point is that the Funds had to investigate the Employer to find out what it knows in order to determine whether suit was appropriate. There is nothing that Defendants have learned from this memo, or could learn, that would advance this case in terms of evidentiary development. In any event, the Funds disclosed this memo to the U.S. government during a criminal investigation of AQE, where the Funds were the victim (see below). In the First Circuit, "the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter." In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 24 (1st Cir. 2003).

- Exhibit H (Various meeting minutes from Funds Delinquency Committee): Among the 74 pages in this document, there appears to be only one reference to Absolute (on page 68 of the ECF filing). The document merely mentions in passing that Absolute has a non-union company in the context of deciding to audit other companies not related to this case. Absolute is obviously aware that it had been audited (see Exhibit E to this motion). The discussions about these other employers have no relevance to this case whatsoever.

- Exhibit K (Email exchange between a Funds representative and counsel): This email does nothing other than state that the Absolute case is "on hold," without explaining why or even what that means. There is no relevance to the timing of litigation, as there is no defense of laches in an ERISA collections case. Operating Engineers Local 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1055 (6th Cir. 2015) ("laches cannot bar an action to collect unpaid monetary contributions owed to the Funds when the suit is brought under ERISA § 515 within the applicable statute of limitations").

- Exhibits N (brief excerpt of McAnarney testimony): This is a companion to Exhibit M, discussed above. This testimony was offered in the AQE matter, and its lack of relevance is addressed under the discussion of Exhibit M. The only connection to Absolute in this testimony is the mere reference to the April 2013 memo (Exhibit G to this motion), which is also addressed above.

   D. It Matters That the Documents Were Disclosed During A Criminal Investigation Conducted on Behalf of And For the Benefit of Plan Participants

Moreover, the fact that documents were first disclosed to the U.S. Attorney's office, working with the U.S. Department of Labor, is an important consideration for this Court. Under ERISA, which is the overarching statute that governs the Funds' operations, there is a fiduciary exception to attorney-client privilege. "As applied in the ERISA context, the fiduciary

13

exception provides that an employer acting in the capacity of ERISA fiduciary is disabled from asserting the attorney-client privilege against plan beneficiaries on matters of plan administration." United States v. Mett, 178 F.3d 1058, 1063 (9th Cir. 1999).

The source of the original disclosure of many of the documents at issues are the U.S. Attorney, which was acting on behalf of and for the benefit of plan participants. (The MLDC provided duplicate discovery to Absolute that it had provided to the U.S. Attorney.) In that case, the U.S. Attorney effectively stood in the shoes of plan participants, and neither the Funds' disclosures nor the MLDC's, effected a waiver of the attorney-client privilege. See Donovan v. Fitzsimmons, 90 F.R.D. 583, 586-87 (N.D. Ill. 1981) (finding that DOL and the plan's participants have "exactly the same interest, securing complete disclosure in order to ferret out and discover any past wrongdoing affecting the Fund"); Solis v. Food Employers Labor Relations Ass'n, 644 F.3d 221, 227 (4th Cir. 2011) ("ERISA fiduciary's duty to act in the exclusive interest of beneficiaries supersedes the fiduciary's right to assert attorney-client privilege.") Providing documents pursuant to this doctrine does not waive privilege.

Even if the Court finds a waiver notwithstanding the fiduciary exception, because of the complications in asserting privilege in this context, this is an extrajudicial disclosure, as discussed above, because the Funds and MLDC were not participants in the underlying criminal investigations other than as a victim (the Funds) or tangentially related party (MLDC). See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 24 (1st Cir. 2003) ("the extrajudicial disclosure of attorney-client communications, not thereafter used by the client to gain adversarial advantage in judicial proceedings, cannot work an implied waiver of all confidential communications on the same subject matter"). There is no credible basis to assert that any of the disclosures were used to gain any advantage against Defendants,

particularly where most of the disclosures had nothing to do with the Defendants. Thus, even if the privilege as to documents such as Exhibit A to Defendants' motion have been lost specifically to those documents, there is no basis to assert a <u>further</u> subject-matter waiver beyond declaring that privilege has been waived as to those documents.

    E.  <u>The Requested Production is Excessive and Any Potential Relevance Is Vastly Outweighed by the Disproportionality of the Request</u>

Not only must requested discovery be "relevant," it must be "<u>proportional</u> to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). "As the recent amendments to Rule 26 make clear, the importance of the information sought to the requesting party's case and the burden on the producing party must be assessed as part of the Court's relevance determination." <u>United Therapeutics Corp. v. Watson Labs., Inc.</u>, 200 F. Supp. 3d 272, 277 (D. Mass. 2016).

The Funds are a substantial operation. Legal representation concerning Absolute's failure to pay benefit contributions and responding to subpoenas in other matters such as AQE has required the use of at least 11 attorneys at multiple law firms over several years. At least one additional law student and a paralegal were involved. Were the Court to grant the motion, it would require the Funds to divert a tremendous amount of resources to paying attorneys to scour their electronic and paper records. This would require dozens upon dozens upon dozens of hours, at tremendous cost to the Funds. And yet, at the end of the day, the material that would likely be produced would include legal opinions and communications with counsel. There is no reasonable likelihood that this discovery would relate to either the core facts of this case, or even Defendants' various affirmative defenses if allowed. Ample relevant material is discoverable from and has been or will be produced by the Funds without this motion (although as noted above the vast majority of discovery is in the Defendants' hands, given that they are the ones who operated their companies in an allegedly unlawful way and possess most relevant

15

information). Other sources of discovery are the Defendants' supervisors and employees, who can provide testimony about the day-to-day operations of the Defendants. To the extent that the Funds have obtained information about these subjects, it has been or will be supplied in discovery.

Legal opinions are not admissible and have no bearing on the issues in dispute (namely the corporate form and operational actions of the Defendants as alter egos and/or single employers). Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997) ("In our legal system, purely legal questions and instructions to the jury on the law to be applied to the resolution of the dispute before them is exclusively the domain of the judge. Accordingly, expert testimony on such purely legal issues is rarely admissible."). United Therapeutics Corp. v. Watson Labs., Inc., 200 F. Supp. 3d 272, 280 (D. Mass. 2016) (holding that the burden of producing confidential documents outweighs minimal relevance).

The burden analysis should also be informed by the underlying purpose of Section 515, the purpose of which is to "simplify delinquency collection" in order to avoid "lengthy, costly and complex litigation concerning claims and defenses unrelated to the employer's promise and the plans' entitlement to the contributions." Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 87 (1982). "Costs of tracking down reneging employers and litigating also come out of money available to pay benefits. The more complex the litigation, the more the plan must spend. Litigation involving conversations between employers and local union officials—conversations to which plans are not privy—may be especially costly, and hold out especially great prospects of coming away empty-handed." Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1151 (7th Cir. 1989). As Plaintiffs have argued in the MPO, this costly litigation is precisely what the Plaintiffs are now facing. With this motion, Defendants

seek to gravely escalate that cost even further, but with little to no benefit to be gained.[9] It is the already the case that the number of depositions necessary in this case will be in double-digits, and discovery has already involved thousands upon thousands of pages of documents. Plaintiffs take the view that this already extensive discovery should not be compounded by the granting of this motion, and should be corrected by granting Plaintiffs' motion for a protective order.

F. There Is No Waiver of Work Product

The proposed order submitted with this motion asks this Court could be read as a request to order Plaintiffs to provide attorney work product. Their memorandum does not specifically seek that. Perhaps an underlying assumption in Defendants' argument is that a waiver of attorney-client privilege per se triggers a waiver of work product? If so, that is not correct. "While voluntary disclosure waives the attorney-client privilege, it does not necessarily waive work-product protection. United States v. Am. Tel. & Tel. Co., 642 F.2d 1285, 1299 (D.C.Cir.1980) (AT & T). As we explained in AT & T, the attorney-client privilege and the work-product doctrine serve different purposes: the former protects the attorney-client relationship by safeguarding confidential communications, whereas the latter promotes the adversary process by insulating an attorney's litigation preparation from discovery. Id. Voluntary disclosure waives the attorney-client privilege because it is inconsistent with the confidential attorney-client relationship. Id. Voluntary disclosure does not necessarily waive work-product protection, however, because it does not necessarily undercut the adversary process." United States v. Deloitte LLP, 610 F.3d 129, 139–40 (D.C. Cir. 2010).

---

[9] The sheer overwhelming volume of discovery that Defendants seek on matters unrelated to the relevant issues in dispute is harassing. "It's difficult to conceive of a reason, other than harassment, for seeking" discovery of this nature. IMDb.com, Inc. v. Becerra, 257 F. Supp. 3d 1099, 1102 (N.D. Cal. 2017) (rejecting discovery requests as not relevant to any party's claim or defense, and because the requests were not proportional to the needs of the case).

If the Defendants have a different argument, Plaintiffs are not in a position to guess at it. What matters for the purpose of this motion is that Defendants have made no claim that work product has been disclosed. Their argument about work product appears directed solely at heading off a claim by the Funds that the material submitted is work product, not that work product actually would have been disclosed. See Memo. of Law, pg. 18 ("To the extent the Funds claim that certain of the disclosed documents described above constitute attorney work product such that they are entitled to greater protection than attorney-client communications, such an argument is unavailing."). Defendants have made no argument why the alleged waivers of attorney-client privilege would trigger waiver of work product.

In any event, Defendants are wrong to claim that "the burden to show the existence of work product protection and that it has not been waived is on the Funds." Memo. of Law, pg. 18. Although the party asserting work product has the burden of establishing its existence, it is the burden of the party claiming a waiver of work product to prove the waiver. Johnson v. Gmeinder, 191 F.R.D. 638, 643 (D. Kan. 2000) (citing cases). Here, there is no question about the existence of work-product; that is the underlying premise of the motion. The question then is whether Defendants proved a waiver of work product. They have not. In any event, Defendants have not argued that any of the documents are work product.

Finally, if Defendants' already expansive request were expanded further to include work product, not only would that be a direct attack on the adversarial legal process, it would increase the burden on Plaintiffs by several orders of magnitude.

G. Defendants Are Not Entitled to the Requested ESI

Concluding their motion, Defendants hide an elephant in a mouse hole by demanding discovery of electronically stored information maintained after October 23, 2015. This would

require the Funds to identify, review, and produce a voluminous number of irrelevant documents. As Defendants note, AEC closed its operations on that date, and there was no further double-breasting after that date. Plaintiffs simply do not understand the relevance of the requested information. Defendants only say there is a "critical importance of the Funds' understanding of and approach toward double-breasting." Memo. of Law, pg. 20. It is not clear what this means, but this appears to refer to its estoppel arguments. The Plaintiffs' understanding of the case can be and has been assessed through its Verified Complaint and the voluminous discovery it has already provided. Moreover, as argued in the MPO, the Plaintiffs' approach and understanding is not a relevant subject of the case. This aspect of the motion should also be denied.

III. <u>Conclusion</u>

    For the above-stated reasons, the Defendants' motion should be denied.

Respectfully submitted,

PLAINTIFFS,

MASSACHUSETTS LABORERS' HEALTH AND WELFARE FUND, ET AL,

By their Attorneys,

<u>/s/ James A.W. Shaw</u>
Anne R. Sills, BBO No. 546576
Kathryn S. Shea, BBO No. 547166
James A.W. Shaw, BBO No. 670993
Sasha N. Gillin, BBO No. 690769
Nathan P. Goldstein BBO, No. 666101
SEGAL ROITMAN, LLP
33 Harrison Avenue, 7th Floor
Boston, MA 02111
(617) 742-0208
asills@segalroitman.com
jshaw@segalroitman.com

Dated: June 29, 2018

**CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 29th day of June 2018.

                                                /s/ James A.W. Shaw
                                                James A.W. Shaw